# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLIMBIA

| | |
|---|---|
| Common Purpose USA, Inc. | ) Civil Action. No. _____ |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LORETTA E. LYNCH, Attorney General of the United States, | ) |
| | ) |
| VANITA GUPTA, Principal Deputy Assistant Attorney General, Civil Rights Division, | ) |
| | ) |
| THE UNITED STATES DEPARTMENNT OF JUSTICE, | ) |
| 950 Pennsylvania Avenue NW | ) |
| Washington, D.C. 20530-0001 | ) |
| | ) |
| DISTRICT OF COLUMBIA | ) |
| Serve: Mayor Muriel Bowser | ) |
| c/o Office of Attorney General | ) |
| Judiciary Square, 441 4th St., NW | ) |
| 6th Floor, South, | ) |
| Washington, D.C. 20001, | ) |
| | ) |
| And | ) |
| | ) |
| Cathy Lanier | ) |
| 300 Indiana Avenue, NW | ) |
| Washington, D.C. 20004 | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT FOR DECLARATORY
## JUDGEMENT, 28 U.S.C. §§ 2201 and 2202

1                               **I.      JURISDICTION**

2          This Court has original subject matter jurisdiction under 28 U.S.C. § 1331, as this matter

1    arises under the Constitution, and laws of the United States. Specifically, this Court is authorized

2    to provide declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 -2202,

3    relating to among other things, Plaintiff's contentions that:

4    **(A)** the interpretations of the Second Amendment as handed down by the Supreme Court

5    and followed by lower courts ("Second Amendment Decisions") have: (1) overlooked and

6    ignored historical facts and precedents resulting in the legally erroneous interpretation of the

7    Second Amendment; (2) failed to consider applicable Constitutional Articles and specific

8    Amendments to the Constitution resulting in the denial of and/or interference with the rights of

9    United States citizens' guaranteed by the First, Second, Fifth, Ninth and Tenth Amendments

10    (U.S. Const. amend. I, II, V, IX, and X); (3) and denied United States citizens their rights to the

11    proper exercise of the powers granted to Congress by Article I, (U.S. Const. art.I), the Office of

12    President, by Article II, (U.S. Const. art. II), the powers granted to the "United States Legislature

13    and the Executive" by Section 4 of Article IV that guarantees and protects every State against

14    domestic violence (U.S. Const. art. IV, §4);

15    **(B)** the decision in *District of Columbia et al v. Heller*, 554 U.S. 570 (2008) resulted in

16    amendments to the Firearms Control Act of 1975 (D.C. Official Code §7-2501)  being adopted

17    by the District of Columbia  (22 D.C. Code §22-4504.01, "DC Carry Law"). To the extent such

18    amendments conflict with  Constitutional guarantees and federal regulation of guns and gun

19    ownership they are subject to preemption under the supremacy clause of Article VI (U.S. Const.

20    art. VI) (hereinafter references will be made to "Article" or "Amendment" when citing to these

21    provisions of the  Constitution);

22    **(C)** the adoption of the DC Carry Law, required the Chief of Police of the Metropolitan

23    Police Department ("DC Chief of Police") to adopt rules and regulations  to issue permits to

1  carry concealed firearms which rules and regulations to the extent they interfere with or prevent

2  the enforcement of federal laws ("Federal Laws") are themselves subject to preemption under the

3  supremacy clause of Article VI;

4     **(D)** the DC Carry Law and DC Carry Permits deny United States citizens that reside in,

5  work in or visit the District of Columbia due process and equal protection of the law in violation

6  of the Fourteenth Amendment; and

7     **(E)** failures of the United States Attorney General and the Department of Justice to take

8  any action to enjoin the DC Carry Law and the DC Carry Permits from interfering with or

9  preventing the enforcement of the federal laws denies United States citizens who reside in, work

10  in or visit the District of Columbia the protections afforded under specific Federal Laws and

11  thereby the protection of their constitutional rights as set forth preceding.

12                              **VENUE**

13     Venue is proper in this Court under 28 U.S.C. § 1391 (b) because a substantial part of the

14  events giving rise to this action occurred in this judicial district, the people whose rights and

15  interests are represented by Common Purpose live and/or work in the district, their rights are

16  being unconstitutionally restricted in this district and the Defendants are officers and employees

17  of the District of Columbia and the United States or their agencies operating under color of law.

18            **II.     NATURE OF THE ACTION**

19     Notwithstanding the interpretations handed down by the Supreme Court and followed by

20  lower courts, Common Purpose brings this action for declaratory judgment pursuant 28  U.S.C.

21  §§ 2201 and 2202, to properly limit the right to bear arms under the Second Amendment to a

22  well-regulated Militia, formed and maintained to insure the security of a free state as expressly

23  set forth in the Federalist Papers, specifically Federalist Paper 29; the consistent practices of the

1    state and federal authorities concerning the purpose and use of militias in the early years of the

2    republic; the fact that the recent court decisions interpreting the Second Amendment not only

3    ignored facts and precedents relevant to its proper interpretation, but also failed to follow and

4    apply basic principles of statutory construction resulting in the eradication of the provisions of

5    Article 1, section 8, Article III, section 2, and Article 5 of the Constitution, the First, Second,

6    Fifth, Ninth, and Fourteenth Amendments to the Constitution and the laws of the United States

7    including 18 U.S.C. §930; 40 U.S.C. §1315; 10 U.S.C. §8-9(c); 28 U.S.C. §2671 et seq.; and the

8    common law of the United States.

9                                             THE PARTIES

10         Common Purpose is a domestic non-profit organization headquartered in Leesburg,

11   Virginia whose corporate purposes are:

12         To define, protect and advance the rights of all United States citizens guaranteed to them
13         by the Articles and Amendments of United States Constitution, in particular, Articles I, II
14         III and VI and the First, Second, Fifth, Ninth and Tenth Amendments interpreted and
15         applied pursuant to the principle of constitutional  balance and well-established canons of
16         construction.
17
18          Membership in Common Purpose is based includes residents of, persons working in

19   and/or visitors to the District of Columbia who have been direct or indirect victims of gun

20   violence in the District.

21         The Attorney General of the United States is the chief legal officer of the United States

22   and heads the Department of Justice, the executive department that is charged with the

23   enforcement of United States Constitution and the laws of the United States for the protection of

24   the rights of United States citizens and their welfare as guaranteed by the United States

25   Constitution and the laws of the United States. The Principal Deputy Assistant Attorney General,

26   Civil Rights Division, is the principal deputy legal officer of the United States to uphold the civil

1  and constitutional rights of United States citizens. The declaratory judgments sought herein will

2  provide a solid basis for the appropriate offices of the Department of Justice to take such actions

3  as are necessary to restore balance in constitutional interpretations so that the provisions of all

4  Articles and Amendments are fairly interpreted and the duties, rights, obligations and protections

5  intended by the authors of those provisions are ensured.

6      The District of Columbia and the Metropolitan Police Department of the District of

7  Columbia are governmental bodies that adopted laws and regulations authorizing the possession

8  and use of guns without consideration of the rights of all citizens or the conflict that such laws

9  create with Federal laws governing the possession and use of firearms.

10      Plaintiff seeks declaratory judgments interpreting Article I. Sections 8, and clauses 12,

11  13, 14, 15, 16;  Article II, first clause;  Article IV, Section 4; Article VI, 2nd paragraph;

12  Amendment I; Amendment II; Amendment V, Amendment IX.; Amendment X (collectively,

13  "Articles and Amendments") of the United States Constitution as intended by its authors'

14  promises made in the Declaration of Independence, to wit:

15      We the People of the United States, in Order to form a more perfect Union, establish
16      Justice, insure domestic Tranquility, provide for the common defence, promote the
17      general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, do
18      ordain and establish this Constitution for the United States of America.
19
20      The declaratory judgments requested are to obtain interpretations of the Articles and

21  Amendments that are ignored by the interpretation of Amendment II's ("Second Amendment")

22  "right to bear arms' by the Supreme Court and perforce by the lower courts subsequent

23  enforcement of the Supreme Court's interpretation of the Second Amendment.

24                  ISSUES PRESENTED

25      Issue 1. Do the Federalist Papers and in particular Federalist Paper No. 29 and the

26  practices and use of militias in the early years of the republic, refute the Supreme Court's

1  decision that the "right to bear arms" was not intended to be limited to a "well-regulated militia,"

2  subject to both state and Congressional regulation?

3  Issue 2. Must court decisions interpreting the Second Amendment adhere to and apply the

4  basic principle that a statute, *a fortiori,* the Constitution, must be read in its entirety?

5  Issue 3. If the answer to Issue 2 is affirmative, has the interpretation of the "right to bear

6  arms" under the Second Amendment struck a proper balance between and among other Articles

7  and Amendments to the Constitution?

8  Issue 4. Can the "right to bear arms" under the Second Amendment be interpreted

9  without reference to other Articles and Amendments of the Constitution without in effect reading

10  those Articles and Amendments out of the Constitution?

11  Issue 5. Given that the "right to bear arms" has been expanded by court rulings to include

12  modern weapons, such as attack weapons, against what foreign or domestic persons, entities,

13  organizations may the right be exercised and who decides against whom and if and when to

14  exercise such right?

15  Issue 6. Has the broad interpretation of the right to bear arms created an environment

16  conducive to anarchy?

17  Issue 7: Does the District's concealed carry laws interfere with the enforcement of federal

18  laws?

19                                      ARGUMENT

20  Issue 1. Do the Federalist Papers and in particular Federalist Paper No. 29 and the

21  practices and use of militias in the early years of the republic, refute the Supreme Court's

22  decision that the "right to bear arms" was not intended to be limited to a "well-regulated militia,"

23  subject to both state and Congressional regulation?

1    The following review of the Federalist Papers begins with Federalist Paper No. 29 which

2    is quoted in its entirety with specifically relevant passages highlighted. Following this review,

3    other Federalist Papers that acknowledge and support the position taken in Federalist Paper No.

4    29 are reviewed.  Additional support from later reports and writings is reviewed with pertinent

5    statements highlighted.

6                                    Federalist Paper No. XXIX (29)

7    In the following quote of Federalist Paper No. 29, the text in italics and upper case is in

8    the original, that is, was being emphasized by its author, Alexander Hamilton, himself."

9    **"To the People of the State of New York:** The power of regulating the militia, and of
10   commanding its services **in times of insurrection and invasion** are natural incidents to
11   the **duties of superintending the common defense, and of watching over the internal**
12   **peace of the Confederacy.** It requires no skill in the science of war to discern that
13   **uniformity in the organization and discipline of the militia** would be attended with the
14   most beneficial effects, whenever they were called into service for the public defense. It
15   would enable them to discharge the duties of the camp and of the field with mutual
16   intelligence and concert an advantage of peculiar moment in the operations of an army;
17   and it would fit them much sooner to acquire the degree of **proficiency in military**
18   **functions** which would be essential to their usefulness. This desirable uniformity can
19   only be accomplished by confiding the regulation of the militia to the direction of the
20   national authority. It is, therefore, with the most evident propriety, that the plan of the
21   convention proposes to empower the Union 'to provide for organizing, arming, and
22   disciplining the militia, and for governing such part of them as may be **employed in the**
23   **service of the United States**, *reserving to the states respectively the appointment of the*
24   *officers, and the authority of training the militia according to the discipline prescribed by*
25   *congress.'*

26   "Of the different grounds which have been taken in opposition to the plan of the
27   convention, there is none that was so little to have been expected, or is so untenable in
28   itself, as the one from which this particular provision has been attacked. If a well-
29   regulated militia be the most natural defense of a free country, it ought certainly to be
30   under the regulation and at the disposal of that body which is constituted the guardian of
31   the national security. If standing armies are dangerous to liberty, an efficacious power
32   over the militia, in the body to whose care the protection of the State is committed, ought,
33   as far as possible, to take away the inducement and the pretext to such unfriendly
34   institutions. If the federal government can command the aid of the militia in those
35   emergencies which call for the military arm in support of the civil magistrate, it can the
36   better dispense with the employment of a different kind of force. If it cannot avail itself
37   of the former, it will be obliged to recur to the latter. To render an army unnecessary, will

7

1   be a more certain method of preventing its existence than a thousand prohibitions upon
2   paper.

3   "In order to cast an odium upon the power of calling forth the militia to execute the laws
4   of the Union, it has been remarked that there is nowhere any provision in the proposed
5   Constitution for calling out the POSSE COMITATUS, to assist the magistrate in the
6   execution of his duty, whence it has been inferred, that military force was intended to be
7   his only auxiliary. There is a striking incoherence in the objections which have appeared,
8   and sometimes even from the same quarter, not much calculated to inspire a very
9   favorable opinion of the sincerity or fair dealing of their authors. The same persons who
10  tell us in one breath, that the powers of the federal government will be despotic and
11  unlimited, inform us in the next, that it has not authority sufficient even to call out the
12  POSSE COMITATUS. The latter, fortunately, is as much short of the truth as the former
13  exceeds it. It would be as absurd to doubt, that a right to pass all laws *necessary* and
14  *proper* to execute its declared powers, would include that of requiring the assistance of
15  the citizens to the officers who may be intrusted with the execution of those laws, as it
16  would be to believe, that a right to enact laws necessary and proper for the imposition and
17  collection of taxes would involve that of varying the rules of descent and of the alienation
18  of landed property, or of abolishing the trial by jury in cases relating to it. It being
19  therefore evident that the supposition of a want of power to require the aid of the POSSE
20  COMITATUS is entirely destitute of color, it will follow, that the conclusion which has
21  been drawn from it, in its application to the authority of the federal government over the
22  militia, is as uncandid as it is illogical. What reason could there be to infer, that force was
23  intended to be the sole instrument of authority, merely because there is a power to make
24  use of it when necessary? What shall we think of the motives which could induce men of
25  sense to reason in this manner? How shall we prevent a conflict between charity and
26  conviction?

27  "By a curious refinement upon the spirit of republican jealousy, we are even taught to
28  apprehend danger from the militia itself, in the hands of the federal government. It is
29  observed that select corps may be formed, composed of the young and ardent, who may
30  be rendered subservient to the views of arbitrary power. What plan for the regulation of
31  the militia may be pursued by the national government, is impossible to be foreseen. But
32  so far from viewing the matter in the same light with those who object to select corps as
33  dangerous, were the Constitution ratified, and were I to deliver my sentiments to a
34  member of the federal legislature from this State on the subject of a militia establishment,
35  I should hold to him, in substance, the following discourse:

36  'The project of disciplining all the militia of the United States is as futile as it would be
37  injurious, if it were capable of being carried into execution. A tolerable expertness in
38  military movements is a business that requires time and practice. It is not a day, or even a
39  week, that will suffice for the attainment of it. To oblige the great body of the yeomanry,
40  and of the other classes of the citizens, to be under arms for the purpose of going through
41  military exercises and evolutions, as often as might be necessary to acquire the degree of
42  perfection which would entitle them to the character of a well-regulated militia, would be
43  a real grievance to the people, and a serious public inconvenience and loss. It would form

1   an annual deduction from the productive labor of the country, to an amount which,
2   calculating upon the present numbers of the people, would not fall far short of the whole
3   expense of the civil establishments of all the States. To attempt a thing which would
4   abridge the mass of labor and industry to so considerable an extent, would be unwise: and
5   the experiment, if made, could not succeed, because it would not long be endured. Little
6   more can reasonably be aimed at, with respect to the people at large, than to have them
7   properly armed and equipped; and in order to see that this be not neglected, it will be
8   necessary to assemble them once or twice in the course of a year.

9   'But though the scheme of disciplining the whole nation must be abandoned as
10  mischievous or impracticable; **yet it is a matter of the utmost importance that a well-**
11  **digested plan should, as soon as possible, be adopted for the proper establishment of**
12  **the militia. The attention of the government ought particularly to be directed to the**
13  **formation of a select corps of moderate extent, upon such principles as will really fit**
14  **them for service in case of need. By thus circumscribing the plan, it will be possible**
15  **to have an excellent body of well-trained militia, ready to take the field whenever**
16  **the defense of the State shall require it.** This will not only lessen the call for military
17  establishments, but if circumstances should at any time oblige the government to form an
18  army of any magnitude that army can never be formidable to the liberties of the people
19  while there is a large body of citizens, little, if at all, inferior to them in discipline and the
20  use of arms, who stand ready to defend their own rights and those of their fellow-citizens.
21  This appears to me the only substitute that can be devised for a standing army, and the
22  best possible security against it, if it should exist.'

23  "Thus differently from the adversaries of the proposed Constitution should I reason on
24  the same subject, deducing arguments of safety from the very sources which they
25  represent as fraught with danger and perdition. But how the national legislature may
26  reason on the point, is a thing which neither they nor I can foresee.

27  "There is something so far-fetched and so extravagant in the idea of danger to liberty
28  from the militia, that one is at a loss whether to treat it with gravity or with raillery;
29  whether to consider it as a mere trial of skill, like the paradoxes of rhetoricians; as a
30  disingenuous artifice to instill prejudices at any price; or as the serious offspring of
31  political fanaticism. Where in the name of common-sense, are our fears to end if we may
32  not trust our sons, our brothers, our neighbors, our fellow-citizens? What shadow of
33  danger can there be from men who are daily mingling with the rest of their countrymen
34  and who participate with them in the same feelings, sentiments, habits and interests?
35  What reasonable cause of apprehension can be inferred from a power in the Union to
36  prescribe regulations for the militia, and to command its services when necessary, while
37  the particular States are to have the *sole and exclusive appointment of the officers*? If it
38  were possible seriously to indulge a jealousy of the militia upon any conceivable
39  establishment under the federal government, the circumstance of the officers being in the
40  appointment of the States ought at once to extinguish it. There can be no doubt that this
41  circumstance will always secure to them a preponderating influence over the militia.

1    "In reading many of the publications against the Constitution, a man is apt to imagine that
2    he is perusing some ill-written tale or romance, which instead of natural and agreeable
3    images, exhibits to the mind nothing but frightful and distorted shapes --

4    "'Gorgons, hydras, and chimeras dire'; discoloring and disfiguring whatever it represents,
5    and transforming everything it touches into a monster.

6    A sample of this is to be observed in the exaggerated and improbable suggestions which
7    have taken place respecting the power of calling for the services of the militia. That of
8    New Hampshire is to be marched to Georgia, of Georgia to New Hampshire, of New
9    York to Kentucky, and of Kentucky to Lake Champlain. Nay, the debts due to the French
10   and Dutch are to be paid in militiamen instead of louis d'ors and ducats. At one moment
11   there is to be a large army to lay prostrate the liberties of the people; at another moment
12   the militia of Virginia are to be dragged from their homes five or six hundred miles, to
13   tame the republican contumacy of Massachusetts; and that of Massachusetts is to be
14   transported an equal distance to subdue the refractory haughtiness of the aristocratic
15   Virginians. Do the persons who rave at this rate imagine that their art or their eloquence
16   can impose any conceits or absurdities upon the people of America for infallible truths?

17   "If there should be an army to be made use of as the engine of despotism, what need of
18   the militia? If there should be no army, whither would the militia, irritated by being
19   called upon to undertake a distant and hopeless expedition, for the purpose of riveting the
20   chains of slavery upon a part of their countrymen, direct their course, but to the seat of
21   the tyrants, who had meditated so foolish as well as so wicked a project, to crush them in
22   their imagined intrenchments of power, and to make them an example of the just
23   vengeance of an abused and incensed people? Is this the way in which usurpers stride to
24   dominion over a numerous and enlightened nation? Do they begin by exciting the
25   detestation of the very instruments of their intended usurpations? Do they usually
26   commence their career by wanton and disgustful acts of power, calculated to answer no
27   end, but to draw upon themselves universal hatred and execration? Are suppositions of
28   this sort the sober admonitions of discerning patriots to a discerning people? Or are they
29   the inflammatory ravings of incendiaries or distempered enthusiasts? If we were even to
30   suppose the national rulers actuated by the most ungovernable ambition, it is impossible
31   to believe that they would employ such preposterous means to accomplish their designs.

32   "In times of insurrection, or invasion, it would be natural and proper that the militia of a
33   neighboring State should be marched into another, to resist a common enemy, or to guard
34   the republic against the violence of faction or sedition. This was frequently the case, in
35   respect to the first object, in the course of the late war; and this mutual succor is, indeed,
36   a principal end of our political association. If the power of affording it be placed under
37   the direction of the Union, there will be no danger of a supine and listless inattention to
38   the dangers of a neighbor, till its near approach had superadded the incitements of self-
39   preservation to the too feeble impulses of duty and sympathy."

40              Federalist Paper No. XLV (40)
41   The Alleged Danger from the Powers of the Union to State Governments

1          James Madison

2          In Federalist Papers No. 40, in addressing the issue of "whether the whole mass of [the

3   powers transferred to the Federal Government] will be dangerous to the portion of authority left

4   in the several States," Madison wrote:

5          The powers delegated by the proposed Constitution to the Federal Government, are few
6          and defined. Those which are to remain in the State Governments are numerous and
7          indefinite. The former will be exercised principally on external objects as war, peace,
8          negotiation, and foreign commerce; with which last the power of taxation will, for the
9          most part, be connected. The powers reserved to the several States will extend to all the
10         objects which, in the ordinary course of affairs, concern the lives, liberties and property
11         of the People, and the internal order, improvement, and prosperity of the State.
12
13                          Federalist Paper No. XLVI (41)
14              The Influence of the State and Federal Governments Compared
15                                  James Madison

16         In Federalist Papers No. 41, in which Madison resumed the subject of No. Paper No. 40,

17   he was inquiring "whether the Federal Government or the State Government will have the

18   advantage with regard to the predilection and support of the people." In part of his response,

19   Madison wrote:

20         The only refuge for those who prophesy the downfall of the State Governments is the
21         visionary supposition that the Federal Government may previously accumulate a military
22         force for the projects of ambition…Extravagant as the supposition is, let it however be
23         made. Let a regular army, fully equal to the resources of the country, be formed; and let it
24         be entirely at the devotion of the Federal Government; still it would not be going too far
25         to say, that the State Governments, with the people on their side, would be able to repel
26         the danger.  The highest number to which, according to the best computation, a standing
27         army can be carried in any country, does not exceed the hundredth part of the whole
28         number of souls; or one twenty-fifth part of the number able to bear arms. This
29         proposition would not yield, in the United States, an army of more than twenty-five or
30         thirty thousand men. To these would be opposed a militia amounting to near half a
31         million of citizens with arms in their hands, officered by men chosen among themselves,
32         fighting for their common liberties, and united and conducted by governments possessing
33         their affections and confidence. It may well be doubted, whether a militia thus
34         circumscribed could ever be conquered by such a proportion of regular troops… Besides
35         the advantage of being armed, which the Americans possess over the people of almost
36         every other nation, the existence of subordinate governments, to which the people are
37         attached, and by which the militia officers are appointed, forms a barrier against the

enterprises of ambition… the additional advantages of local governments chosen by [the people] themselves,…and of officers appointed out of the militia, by these governments, and attached both to them and the militia, it may be affirmed… that the throne of every tyranny in Europe would be speedily overturned…

The power of regulating and calling forth the militia has been already sufficiently vindicated and explained. (Hamilton Fed. Pap. No. 29)

Federalist Paper No. LIII (53)
Not Titled
James Madison

In addressing the term of years for a legislator in the Federal Government, Madison

establishes that some knowledge about the subject of the legislation is needed and asks a series

of rhetorical questions, one of which is as follows:

How can uniform regulations for the militia be duly provided without a similar knowledge of some internal circumstances by which the states are distinguished from each other?  These are the principal objects of federal legislation, and suggest most forcibly, the extensive information which the representatives ought to acquire.

A few pages later, Madison continued -

With regard to the regulation of the militia, there are scarcely any circumstances in reference to which local knowledge can be said to be necessary.

Addressing the issue of whether the federal seat of government could be located in a

specific state versus being located in its own area and not within any state, Madison addressed

the following concern -

… the honorable member sees great danger in the provision concerning the militia… the authority of training the militia, and appointing the officers, is reserved to the states. Congress ought to have the power of establishing an uniform discipline throughout the states; and to provide for the execution of the laws, suppress insurrections and repel invasions: these are the only cases wherein they can interfere with the militia… Without uniformity of discipline, military bodies would be incapable of action: without a general controlling power to call forth the strength of the union, to repel invasions…

Speech in The Virginia Ratifying Convention on Direct Taxation
June 11, 1788

1   In justifying the need for direct taxation, the question was posed as to what forces could

2   be called out in the event of an attack by a foreign power.  In one argument presented, Madison

3   stated, "The inability of the government to raise and support regular troops, would compel us to

4   depend on militia."

5   Speech in The Virginia Ratifying Convention on the Militia
6   June 14, 1788

7   In addressing the issue of whether the "purse" and the "sword" ought not to be put in the

8   same hands, Madison states –

9   The purse is in the hands of representatives of the people.  They have the appropriation of
10  all monies. They have the direction and regulation of land and naval forces. They are to
11  *provide* for calling forth the militia – and the president is to have the command; and in
12  conjunction with the senate, to appoint the officers. ("*provide*" italicized in original).
13
14  Speech in The Virginia Ratifying Convention on Control of the Military
15  June 16, 1788

16  … if there were any object, which the general government ought to command, it would
17  be the direction of national forces. And as the force which lies in militia is most safe, the
18  direction of that part ought to be submitted to, in order to render another force
19  unnecessary… Give me leave to say that the only possible way to provide against
20  standing armies, is to make them unnecessary.  The way to do this, is to organize and
21  discipline our militia, so as to render them capable of defending the country against
22  external invasions, and internal insurrections… I really thought the objection to the
23  militia was at an end… The militia ought to be called forth to suppress smugglers… The
24  case actually happened at Alexandria.  There were a number of smugglers, who were too
25  formidable for the civil power to overcome. The militia quelled the sailors, who,
26  otherwise, would have perpetrated their intentions. Should a number of smugglers have a
27  number of ships, the militia ought to be called forth to quell them.
28
29  In responding to an argument based on the riot-act of Great-Britain, Madison

30  argued –

31  It never was a complaint in Great-Britain, that the militia could be called forth. If riots
32  should happen, the militia are proper to quell it…
33
34  And apparently, some states had adopted militia laws at this early time in the life of the

35  nation.

The militia law of every state north of Maryland, is less rigorous than the particular law of this state… I think the people of those states would not agree to be subjected to a more harsh punishment than their own militia laws inflict. An act passed a few years ago, in this state, to enable the government to call forth the militia to enforce the laws, when a powerful combination should take place to oppose them. This is the same power the constitution is to have. There is a great deal of difference between calling forth the militia, when a combination is formed to prevent the execution of the laws, and the sheriff or constable carrying with him a body of militia to execute them in the first instance; which is a construction not warranted by the clause. There is an act also in this state, empowering the officers of the customs to summon any persons to assist them when they meet with obstruction in executing their duty. This shews the necessity of giving the government power to call forth the militia when the laws are resisted. It is a power vested in every legislature in the union, and which is necessary to every government.

Speech in Congress Proposing Constitutional Amendments
June 8, 1789

Fourthly.  That in article 1st, section 9, between clauses 3 and 4, be inserted these clauses, to wit, …The right of the people to keep and bear arms shall not be infringed; a well armed, and well regulated militia being the best security of a free country: but no person religiously scrupulous of bearing arms, shall be compelled to render military service in person.

Seventh Annual Message to Congress, Washington, December 8, 1815

In reporting on the balance of the money in Treasury on the first day of January 1815 and

use of funds, Madison's report included the following –

*Fellow-Citizens of the Senate and of the House of Representatives: …*
There will probably be some addition to the public debt upon the liquidation of various claims which are depending, and a conciliatory disposition on the part of Congress may lead honorably and advantageously to an equitable arrangement of the militia expenses incurred by the several States without the previous sanction or authority of the Government of the United States… and I cannot press too much on the attention of Congress such a classification and organization of the militia as will most effectively render it the safeguard of a free state… If experience has shewn in the recent splendid achievements of militia the value of this resource for the public defense, it has shewn also the importance of that skill in the use of arms and that familiarity with the essential rules of discipline which can not be expected from the regulations now in force. With this subject is intimately connected the necessity of accommodating the laws in every respect to the great object of enabling the political authority of the Union to employ promptly and effectually the physical power of the Union in the cases designated by the Constitution.

Thomas Paine
The American Crisis Number 1 December 19, 1776

These are the times that try men's souls: The summer soldier and the sunshine patriot will, in this crisis, shrink from the service of his country; but he that stands it NOW, deserves the love and thanks of man and woman.  Tyranny, like hell, is not easily conquered; yet we have this consolation with us, that the harder the conflict, the more glorious the triumph.  What we obtain too cheap, we esteem too lightly: - 'Tis dearness only that gives everything its value.  Heaven knows how to set a proper place upon its goods; and it would be strange indeed, if so celestial an article as FREEDOM should not be highly rated. America did not, nor does not, want force; but she wanted a proper application of that force… From an excess of tenderness, we were unwilling to raise an army, and trusted our cause to the temporary defence of a well meaning militia.  A summer's experience has now taught us better; yet with those troops, while they were collected, we were able to set bounds to the progress of the enemy, and, thank God! They are again assembling. I always considered a militia as the best troops in the world for a sudden exertion, but they will not do for a long campaign.

DEBATES ON THE CONSTITUTION
What Shelter from Arbitrary Power?
Reply to Wilson's Speech: "A Democratic Federalist"
Pennsylvania Herold (Philadelphia), October 17, 1787

In responding to the assumed suggestion that Wilson was asserting that "there is no

nation in the world without a *standing army in time of peace…" (Italics in original),* the

following rebuttal was made –

[There's] the example of Switzerland… a *republic,* whose *thirteen* cantons, like our thirteen states, are under a *federal government*… [a] nation [that] has preserved its freedom for many ages, with the sole help of a militia, and has never been known to have a standing army, except when in actual war. – Why should we not follow so glorious an example, and are we less able to defend our liberty without an army, than that brave, but small nation, which with its militia alone has hitherto defied all Europe? *(Italics in original).*

Articles of Confederation
Article VI. 4th Paragraph

No vessels of war shall be kept up in time of peace by any state… but every state shall always keep up a well regulated and disciplined militia, sufficiently armed and accoutered, and shall provide and constantly have ready for use, in public stores, a due number of field pieces and tents, and a proper quantity of arms, ammunition and camp equipage.

15

1       The U.S. Constitution, Article I Section 8

2  The Congress shall have Power… To provide for calling forth the Militia to execute the
3  Laws of the Union, suppress Insurrections and repel Invasions;
4  To provide for organizing, arming, and disciplining, the Militia, and for governing such
5  Part of them as may be employed in the Service of the United States, reserving to the
6  States respectively, the Appointment of the Officers, and the Authority of training the
7  Militia according to the discipline prescribed by Congress.

8

9       The U.S. Constitution, Article II Section 2

10  The President shall be the Commander in Chief of the Army and Navy of the United
11  States, and of the Militia of the several States when called into the actual Service of the
12  United States…

13

14     Anti-Federalist Letters from the "Federal Farmer"
15        to "The Republican"
16       "Examine Coolly Every Article,
17         Clause, and Word"
18       Letter III, October 10th, 1787

19  The state must train the militia in such form and according to such systems and rules as
20  Congress shall prescribe: and the only actual influence the respective states will have
21  respecting the militia will be in appointing the officers… provision is made for Congress
22  to call forth the militia for the execution of [the laws of the union]- and the militia… may
23  be called out under military officers… to enforce an execution of the federal laws…

24

25      Opponent Robert Whitehill's Amendments
26        And the Final Vote
27        December 12, 1787

28   Robert Whitehill made a motion for adjourning to some remote day, consideration of

29 articles that he suggested could be taken collectively as a bill of rights or separately as

30 amendments to the general form of government proposed. Among these was the following.

31  11. That the power of organizing, arming and disciplining the militia, (the manner of
32  disciplining the militia to be prescribed by Congress) remain with the individual states,
33  and that Congress shall not have authority to call or march any of the militia out of their
34  own state, without the consent such state, and for the length of time only as such state
35  shall agree.

36

37     "The Best Constitution We … Have Any Right To Expect"
38       *Refutation of the "Federal Farmer":*

*Timothy Pickering to Charles Tillinghast*
Philadelphia, December 24, 1787

On a like principle it is proper that Congress should have power to provide for organizing, arming, and disciplining the militia, and for calling it forth to execute the laws of the union, suppress insurrection, & repel invasions. As the militia of different states may serve together, the great advantages of uniformity in their organizations, arms & discipline must be obvious to every man who is possessed of any degree of military knowledge. But this uniformity can be introduced & maintained only by the power of the general government. It is also equally necessary that Congress should have the power to call forth the militia for the purposes expressed in the constitution… I will add one remark – That vesting *Congress* with the power to call out the militia, as exigencies of the union may require, instead of being complained of as a grievance, demands the warmest approbation of those who are in dread of a standing army; for that efficient command of the militia will forever render it unnecessary to raise a permanent body of troops, excepting only the necessary guards requisite for the frontiers & arsenals.

*James Wilson's Summation and Final Rebuttal*
December 11, 1787

[Note: James Wilson was a leading legal theorist, and one of the six original

justices appointed by <u>George Washington</u> to the <u>Supreme Court of the United States</u>.]

It is said, that congress should not possess the power of calling out the militia, to execute the laws of the union… nor the president have the command of them, when called out for such purposes. I believe any gentlemen who possess military experience will inform you, that men without an uniformity of arms, accouterments and discipline, are no more than a mob in a camp; that in the field, instead of assisting, they interfere with one another.  If a soldier drops his musket, and his companion, unfurnished with one, takes it up, it is of no service, because his cartridges do not fit it.  By means of this system, a uniformity of arms and discipline will prevail throughout the United States. The militia formed under this system, and trained by the several states will be such a bulwark of internal strength, as to prevent the attacks of foreign enemies. In every point of view, this regulation is calculated to produce the best effects.  How powerful and respectable must the body of the militia appear, under general and uniform regulations! How disjointed, weak and inefficient are they at present!

Notes on the State of Virginia
QUERY IX
Thomas Jefferson

*The number and condition of the militia and regular troops, and their pay?*
The following is a state of the militia, taken from returns of 1780 and1781, except in those counties marked with and asterisk, the returns are somewhat older.

1    [Note: What followed was a chart that set forth the details of the militias by county. And

2  then Mr. Jefferson continued.]

3    Every able body freeman, between the ages of 16 and 50, <u>is enrolled in the militia. Those</u>
4    <u>of every county are formed into companies, and these again into one or more battalions,</u>
5    according to the numbers in the county. <u>They are commanded by colonels, and other</u>
6    <u>subordinate officers, as in the regular service. In every county is a county-lieutenant, who</u>
7    <u>commands the whole militia in his county,</u> but ranks only as a colonel in the field. We
8    have no general officers always existing. These are appointed occasionally, when an
9    invasion or insurrection happens, and their commission determines with the occasion.
10   The governor is head of the military, as well as civil power. <u>The law requires every</u>
11   <u>militia-man to provide himself with the arms usual in the regular service…</u> In the middle
12   country a fourth or fifth part of them may have such <u>firelocks</u> as they are provided <u>to</u>
13   <u>destroy noxious animals which infest their farms;</u> and on the western side of the Blue
14   ridge they are generally <u>armed with rifles.</u>  <u>The pay of our militia,</u> as well as of our
15   regulars, is that of the Continental regulars.  The condition of our regulars, of whom we
16   have none but Continentals, and part of a battalion of state troops, is so constantly on the
17   change, that a state of it at this day would not be its state a month hence…
18
19                 Thomas Jefferson, First Annual Message, December 8, 1801

20    In addressing budget matters, Jefferson recounted that the secretary of war had formed a

21  statement of all posts and stations where garrisons would be expedient and the number of men

22  needed for each garrison and the funding needed therefore was found "considerably short of the

23  present military establishment," and continued:

24   FELLOW CITIZENS OF THE SENATE AND HOUSE OF REPRESENTATIVES:..
25   For defence against invasion, their number is as nothing; nor is it conceived needful or
26   safe that a standing army should be kept up in time of peace for that purpose. Uncertain
27   as we must ever be of the particular point in our circumference where an enemy may
28   choose to invade us, <u>the only force which can be ready at every point and competent to</u>
29   <u>oppose them, is the body of neighboring citizens as formed into a militia.</u> On these
30   collected from the parts most convenient, in numbers proportioned to the invading foe, it
31   is best to rely, not only to meet the first attack, but if it threatens to be permanent, to
32   maintain the defence until regulars may be engaged to relieve them. <u>These considerations</u>
33   <u>render it important that we should at every session continue to amend the defects which</u>
34   <u>from time to time show themselves in the law for regulating the militia, until they are</u>
35   <u>sufficiently perfect. Nor should we nor or at any time separate, until we can say we have</u>
36   <u>done everything for the militia which we could do were an enemy at our door.</u>
37

1    In reporting on his receipt of information on the activities of Aaron Burr to take actions

2  against the Union, Jefferson reported as follows:

3    Thomas Jefferson, *Special Message on the Burr Conspiracy,* January 22, 1807

4    FELLOW CITIZENS OF THE SENATE AND HOUSE OF REPRESENTATIVES: …
5    Orders were dispatched to every intersecting point on the Ohio and Mississippi, from
6    Pittsburg to New Orleans, for the employment of such force either of the regulars or of
7    the militia… to seize on all the boats and stores provided for [Burr's] enterprise, to arrest
8    the persons concerned and to suppress… the further progress of [Burr's] enterprise.
9    In Kentucky… [u]nder and act of their legislature of December 23d, militia was instantly
10   ordered to different points [to intervene against Burr]. By… December nineteenth, orders
11   were sent to the governors of New Orleans and Mississippi… to hold the militia of their
12   territories in readiness to co-operate for their defence, with the regular troops and armed
13   vessels then under command of General Wilkinson.
14
15                    Thomas Jefferson, Eighth Annual Message, November 8, 1808

16   TO THE SENATE AND HOUSE OF REPRESENTATIVES OF THE UNITED
17   STATES:
18   I have not thought it necessary in the course of the last season to call for any general
19   detachments of militia or volunteers under the laws passed for that purpose.  For the
20   ensuing season, however, they will require to be in readiness should their services be
21   wanted. Considering the extraordinary character of the times in which we live, our
22   attention should unremittingly be fixed on the safety of our country.  For a people who
23   are free, and who mean to remain so, a well-organized and armed militia is their best
24   security.  It is, therefore, incumbent on us… to revise the condition of the militia, and ask
25   ourselves if it is prepared to repel a powerful enemy at every point of our territories
26   exposed to invasion… Congress alone have the power to produce a uniform state of
27   preparation in this great organ of defence…
28
29   Issue 2. Do the court decisions interpreting the Second Amendment fail to adhere to and

30  apply the basic principle that a statute, *a fortiori,* the Constitution, must be read in its entirety?

31    A cardinal rule of construction is that a statute should be read as a harmonious whole,

32  with its various parts being interpreted within their broader statutory context in a manner that

33  furthers statutory purposes. Justice Scalia, who has been in the vanguard of efforts to redirect

34  statutory construction toward statutory text and away from legislative history, has aptly

35  characterized this general approach.

1    Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous
2    in isolation is often clarified by the remainder of the statutory scheme — because the
3    same terminology is used elsewhere in a context that makes its meaning clear, or because
4    only one of the permissible meanings produces a substantive effect that is compatible
5    with the rest of the law. *United States Savings Ass'n v. Timbers of Inwood Forest*
6    *Associates*, 484 U.S. 365, 371 (1988) (Citations omitted.)

7

8    This was not a novel approach. In 1850 Chief Justice Taney described the same process:

9    "In expounding a statute, we must not be guided by a single sentence or member of a sentence,

10    but look to the provisions of the whole law, and to its object and policy." *United States v.*

11    *Boisdoré's Heirs*, 49 U.S. (8 How.)  (1850).

12    The Supreme Court's decision in *District of Columbia v. Heller,* 554 U.S. 570 (2008) and

13    the following lower court decisions do not follow Chief Justice Taney's 165 year old ruling.  The

14    decisions focus only on "the right of the people to keep and bear arms."  Their consideration of

15    the introductory clause that modifies this right as one exercised by "[a] well regulated Militia …

16    necessary to the security of a free State," is perfunctory and suggests that the narrow

17    interpretation of the Amendment was predetermined.  Indeed, while Justice Scalia in *District of*

18    *Columbia v. Heller,* engages in a lengthy review of various pronouncements to support the

19    conclusion that the plain language of the Second Amendment was not intended to limit the right

20    to bear arms by those in a well regulated Militia for the security of a free State, his decision only

21    alludes to Federalist Paper No. 29 without any analysis or discussion.   The conclusion is that

22    Justice Scalia and the decision he authored ignored a fundamental principle of constitutional

23    interpretation requiring courts to look at the "provisions of the whole law, and to its object and

24    policy."

25    <u>Issue 3.</u> If Issue 2 is decided in the affirmative, does it follow that Supreme Court's

26    interpretation of the Second Amendment has failed to strike a proper balance between and

27    among other Articles and Amendments to the Constitution?

1      An interpretation of the Second Amendment consistent with the principles of

2  constitutional and statutory construction requires it be read and interpreted in line with express

3  declarations in the Declaration of Independence and the Constitutional Articles and Amendments

4  cited hereinafter.

5      We hold these Truths to be self-evident, that all Men are created equal, that they are
6      endowed … with certain unalienable Rights, that among these are Life, Liberty, and the
7      pursuit of Happiness – That to secure these Rights, Governments are instituted among
8      Men, deriving their just Powers from the Consent of the Governed, that whenever any
9      Form of Government becomes destructive of these Ends, it is the Right of the People to
10     alter or abolish it …
11
12     Read in the context of today's unending gun violence and the reported support of the

13  majority of the Governed, victims of gun violence have been deprived of their unalienable

14  Rights. Those not yet victims, but exposed to the unchecked presence of gun violence, and to

15  ever present danger of such violence, emanating from the one sided support for the right to bear

16  arms, have also been deprived of their unalienable Rights to be secure in their expectations for

17  their lives, liberties and pursuits of happiness.

18     The deprivation of these unalienable rights is all the more inexplicable in that the Second

19  Amendment Decisions do not address the relevance and effect of Article I of the Constitution

20  vesting all legislative powers in the Congress of the United States. Of controlling relevance in

21  this context are Section 8, and clauses 12, 13, 14, 15, 16 and 18.

22     Section 8 vests power in Congress to "provide for the common Defence and general

23  Welfare of the United States." Clause 12 authorizes Congress "To raise and support Armies…"

24  Clause 13 authorizes Congress "To provide and maintain a Navy." Clause 14 authorizes

25  Congress "To make Rules for the Government and Regulation of the land and naval forces."

26  Clause 15 provides the authority "To provide for calling forth the Militia to execute the Laws of

27  the Union, [and] suppress Insurrections…" Clause 16 grants Congress the power "To provide for

1    organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be

2    employed in the Service of the United States …" Clause 18 authorizes the Congress "To make

3    all laws which shall be necessary and proper for carrying into Execution the foregoing powers,

4    and all other Powers vested by this Constitution in the Government of the United States, or in

5    any Department or Officer thereof."

6          These enumerated powers and authority are eviscerated by the Second Amendment

7    Decisions that establish the unfettered right of individuals to bear arms outside a well-regulated

8    Militia as intended by the authors of the Second Amendment.

9          Moreover, Clause 16 expressly reserved "to the States respectively, the Appointment of

10   Officers, and the Authority of the Officers, and the Authority of training the Militia according to

11   discipline prescribed by Congress." By ignoring these express provisions, the Second

12   Amendment Decisions simply read out of the Constitution these carefully structured provisions

13   denying both Congress and the States their constitutionally granted powers and authority over

14   the right to bear arms.

15         In the same vein, Article II, Section 2 provides that "The President shall be Commander

16   in Chief of the Army and Navy of the United States, and of the Militia. By holding that the right

17   to bear arms is not limited to well-regulated Militias, the Second Amendment Decisions usurps

18   the authority of the President as Commander in Chief expressly provided by Article II, Section 2.

19   The usurpation arises from the failure in the first instance to limit the right to bear arms to

20   Militias thereby investing in individuals or groups of individuals the right to bear arms outside

21   the authority of the Commander in Chief. What is created is an independent force bearing arms

22   without restriction as to their use.

An uncontrolled force bearing arms raises the further issue of against whom those arms can or may be used - an issue addressed hereinafter.  The Second Amendment Decisions do not address this question demonstrating again that those decisions are not based on an interpretation that took into consideration all relevant provisions of the Constitution.

Article IV, Section 4 provides that the United States … shall protect … against domestic violence."  Studies have shown that more Americans have been killed in domestic gun violence than all the military casualties in all the wars since the beginning of the Republic.

> Nearly 1.2 million Americans have died in all wars in U.S. history since the Revolutionary War began in 1775; by comparison, nearly 1.4 million Americans have died by firearms since Robert F. Kennedy was fatally shot June 5, 1968. In other words, more Americans have died in the past 45 years from domestic gun fire than have died in all military conflicts since the founding of the nation. (Reported in the *Washington Post,* December 30, 2013).

The unfettered right to bear arms as sanctioned by the Second Amendment Decisions ignores, condones and fosters the failure of the United States to protect against domestic violence.

Article VI, 2nd paragraph provides that –

> This Constitution, and the laws of the United States which shall be made in Pursuance thereof… or which shall be made under the authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the contrary notwithstanding.

If as argued herein, the right to bear arms is limited to those in a well-regulated militia, the Second Amendment Decisions did not consider whether any state laws or rulings on gun rights would be subject to preemption under Article VI for failing to limit the right to those in a well-regulated militia.

Amendment I of the Constitution provides that "Congress shall make no law… abridging the right of the people to peaceably assemble." The Second Amendment Decisions did not take into consideration the infringement of this right created by the unfettered right to bear arms in

1    public places.  Concealed carry laws make this infringement all the more pronounced. Recent

2    shootings at public gathering places such as movie theaters and shopping malls creates a

3    cognizable fear that interferes with the right to peaceable assembly.

4         The Second Amendment Decisions' do not consider that the right to bear arms is further

5    qualified by that right being "necessary to the security of a free State." Here the Second

6    Amendment Decisions fail in proper interpretation by ignoring not only other provisions of the

7    Constitution, but also the express language of the Second Amendment itself. The Second

8    Amendment Decisions do not address how the unmitigated right to bear arms has and is affecting

9    the "security of a free State." Given the killings in schools, entertainment venues, churches, and

10   on the streets in cities after cities, the purpose of conditioning the right to bear arms on the goal

11   of ensuring the security of a free state has not been examined, has not been considered by the

12   Second Amendment Decisions and created environments where there is no such "security ."

13        Amendment V provides that "No person shall … be deprived of life, liberty, or property,

14   without due process of law…" The Second Amendment Decisions did not address or consider

15   how the right to bear arms as presently interpreted results in the deprivation of life, liberty or

16   property. The unregulated right to bear arms has taken lives, restricts everyday liberties and

17   deprives people of their property.  In the last case mentioned, some businesses have posted signs

18   asking that people do not carry guns onto their business premises. Shootings at movie theaters is

19   making people think it unsafe to attend such establishments. The same fear has to arise at any

20   public gathering place and as a result patronage of such commercial establishments can fall

21   costing businesses loss revenues.

22        Amendment IX provides that "The enumeration in the Constitution of certain rights shall

23   not be construed to deny or disparage others retained by the people." The Second Amendment

1    Decisions did not consider how the existing construction of the enumerated right to bear arms

2    has in fact led to the denial and disparagement of the other rights of the people such as the rights

3    to life, liberty and pursuit of happiness, the right not to be deprived of life, liberty or property

4    without due process of law, the right to peaceably assemble, the right to be secure in a free State.

5            Amendment X provides that "The powers not delegated to the United States by the

6    Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the

7    people." The Second Amendment Decisions did not consider how their interpretation of the right

8    to bear arms has infringed on the powers reserved to the people.  What powers are so reserved?

9    Do they include the include the power for example to demand that the courts and Congress be

10   responsive to the demand for meaningful and effective gun control laws and to shun the

11   influence, threats and blandishments of the pro-gun lobbyists whose interests are driven by

12   profits and their own financial gain?

13           Issue 4. In light of the presentations made and reviewed in Issue 3, have the Second

14   Amendment Decisions failed to balance the "right to bear arms" against other constitutional

15   powers and guarantees?

16           Constitutional balance is another way of expressing the legal principle enunciated in the

17   beginning of this filing citing Chief Justice Taney: "In expounding a statute, we must not be

18   guided by a single sentence or member of a sentence, but look to the provisions of the whole law,

19   and to its object and policy." *United States v. Boisdoré's Heirs*, 49 U.S. (8 How.)  (1850).

20   In short, the Second Amendment Decisions have failed to address, much less harmonize

21   seemingly conflicting provisions in the Constitution so as to ensure that each constitutional

22   provision is given effect and not read out of the document.

1    <u>Issue 5.</u> Given that the "right to bear arms" has been expanded to include modern

2    weapons, such as attack weapons, against what foreign or domestic persons, entities,

3    organizations may the right be exercised and who decides against whom and if and when to

4    exercise such right?

5    The "right to bear arms" has evolved into a perceived "right" that has the "unintended"

6    consequence of arming individuals or groups without any consideration of against whom the

7    weapons of today may be used. Defenders of gun rights argue that guns are needed to protect

8    home, property and person from "criminals." The results of guns in American society do not

9    support these assertions. While the concern for self-protection is understandable, the weapons

10   that are being purchased are in a large part military weapons. Left unexamined is the fact that

11   military weapons are designed and intended to be used in military operations.  The question

12   raised by this fact is against whom will these weapons be used?

13   Common sense dictates that military weapons in private, untrained and undisciplined

14   hands will not be used to repel a foreign invader.  So, against what domestic entities will these

15   military weapons be used? The police? The national guard? Federal agents? Other law

16   enforcement agencies? People or institutions with which the weapon bearers disagree, or against

17   whom they have a personal prejudice? Past and present instances of gun violence, not even

18   involving military-type weapons, provide examples.

19   Issue 6. Has the singularly broad interpretation of the right to bear arms created an

20   environment for anarchy?

21   There is instances to warrant concern that "today's" right to bear arms has and is creating

22   an environment that breeds anarchy. To name just two - The Branch Davidians, Waco, Texas.

23   Cliven Bundy, a rancher in Bunkerville, Nevada.

1  … Bunkerville was transformed into some fevered final bastion of freedom.  For some
2  pundits, this was a simple tale about a rancher defending his way of life against an
3  overgrown federal bureaucracy… In the frenzy to pillory the government that ensued,
4  almost no viewpoint seemed too extreme to voice. Emboldened by attention from such
5  high-profile conservative media figures as Sean Hannity, armed militia members set up
6  check points, stopped traffic and occupied roads. At one point, local police had to
7  physically place themselves between the militia and agents from the Bureau of Land
8  Management, fearing for their lives while trying to prevent a blood bath. ("Burned by the
9  rants of hotheads," Steven Horsford, Congressman for Nevada's 4th District, *Washington*
10  *Post,* July20, 2014.
11
12  But there are more - the 50th Precinct Station Bronx, New York and the shootings of

13  Officers Wenjian Liu and Rafael Ramos, The Navy Yard Shootings in Washington, D.C., the

14  massacre at the historical Emanuel African Methodist Episcopal Church in Charleston, South

15  Carolina, the flare up again in Ferguson, Missouri.

16  On or about April 16, 2015, a candidate for the Republican Party's nomination for

17  President, Senator Ted Cruz, sent a fund raising letter email under the subject line "2nd

18  Amendment against tyranny."  In it, it is reported that the email message stated "The 2nd

19  Amendment… is a Constitutional right to protect your children, your family, your home, our

20  lives, and to serve as the ultimate check against government tyranny – for the protection of

21  liberty."  Commenting on this assertion, UCLA law professor Adam Winkler, a Second

22  Amendment expert, identified this as the "insurrectionist" argument popular among passionate

23  gun owners and members of the National Rifle Association.

24  Curtis Wade Holley fatally shot Leon County, Florida Sheriff's Deputy Christopher

25  Smith and wounded another deputy after he ambushed police officers responding to his having

26  set -his house on fire.  Holley was identified as having "anti-government, and anti-

27  establishment" views and previously had threatened law enforcement authorities.

28  Authorities in Tennessee arrested Jimmie Randall Johnson Jr. whom police reported had

29  threatened to kill President Obama, 2012 Republican presidential nominee Mitt Romney,

1    Representative Paul Ryan (R-Wis.), state Homeland Security Advisor David W. Purkey and

2    Tennessee Bureau of Investigations Special Agent Tommy Farmer.  Johnson was quoted as

3    threatening to "come with an AK" and kill these men and stated he would "light Nashville up."

4    *Washington Post*, by Sean Sullivan, July 23, 2014. How many more instances must occur before

5    authorities take the threat of anarchy seriously?

6         Issue 7: Whether the result of concealed carry laws prevents or interferes with the

7    enforcement of federal laws?

8         One formal definition of "anarchy" is – "political and social disorder due to the absence

9    of governmental control." Synonyms: lawlessness, disruption, turmoil. (Dictionary.com). Have

10   the laws permitting the right to carry concealed weapons created an area that lacks any

11   meaningful government control?

12        The District of Columbia has adopted regulations authorizing the concealed carriage of

13   guns.   Its efforts to provide some conditions on concealed carriage has been challenged as in

14   violation of the Second Amendment.  The issue raised is whether concealed carriage prevents or

15   interferes with the enforcement of federal laws protecting the public and governmental

16   employees and sites from gun violence.  The following citations are examples of the federal laws

17   that will or could be compromised or interfered with by the authorization of concealed carriage.

18        Titles 18 USC §930 prohibits and criminalizes possession of firearms on Federal facilities

19   including military installations requiring a reasonable search for firearms before granting access

20   to Federal facilities. Under concealed carriage rights, any such search could be resisted as in

21   violation of the Second and Fourth Amendments.

22        Title 40 USC §1315 requires the Department of Homeland Security to protect Federal

23   facilities and the persons on the property from terrorists and criminal threats and requires

28

1   reasonable searches to mitigate the risks of workplace violence on Federal facilities in full

2   compliance with 18 USC §930. Under concealed carriage rights, any such search could be

3   resisted as in violation of the Second and Fourth Amendments.

4        Navy Policy Instruction OPNA VINST 5530.14E (Chapter 3.3006, pages 3-5 (January

5   28, 2009 specifically prohibits the non-preapproved possession of fire arms on a Navy

6   installation and specifically requires sentries at entry control points (ECP) to perform

7   "inspections of packages, vehicles and individuals" and deny access to persons who are not

8   authorized (access) or represent a criminal threat." *Id*. Chapter 2.0210(a) (2) at page 2-6.

9   Installation Commanding Officers (ICOs) "shall" ensure that policy dealing with entry control

10  point (ECP) access include "special precautions" which "shall be watchful for the unauthorized

11  introduction" of "weapons" to the installation (Id. at page 2-6).Concealed carriage laws can

12  interdict such inspections and allow resistance on Second and Fourth Amendment objections.

13       Title 10 USC §8-9(c) provides that any person who commits a criminal offense on a

14  military installation may be apprehended and taken into custody until the proper authority may

15  be notified. This law is frustrated by preventing the enforcement of 18 USC §930 because the

16  permit to carry a concealed weapon frustrates the ability to conduct a reasonable search before

17  granting access.

18       Title 41 CFR 102-81.10 mandates Federal agencies on Federal property under the control

19  of the GSA acting under delegated authority from DHA to provide security and protection of the

20  real estate they occupy including protection of persons within the property. Concealed carriage

21  can frustrate efforts to provide security and protection.

1       Title 41 CFR 102-74.440 makes the possession of firearms or other dangerous weapons

2   in Federal facilities and Federal court facilities by unauthorized persons a criminal offense.

3   Concealed carriage can defeat the enforcement of this regulation.

4       Title 41 CFR 102-74.370 authorizes Federal agencies to conduct a full search of a person

5   entering a Federal facility and the vehicle the person is driving to inspect for prohibited items

6   including firearms. Concealed carriage would allow objections to such searches as in violation of

7   the Second and Fourth Amendments.

8       DOD Security Engineering Facilities Planning Manual (UFC 4-020-01) (September 11,

9   2008) requires protective measures to mitigate against "insider" threats to Federal facility and

10  personnel security.

11      Guidelines, Policies, Rules and Instructions of the Director, Department of the Navy

12  (DON) Central Adjudication Facility (DON CAF) requires military and civilian personnel and

13  cleared contractor employees to continuously report known security incidents/adverse

14  information involving persons holding security clearances to the DON CAF and/or the Defense

15  Industrial Security Clearance Office (DISCO) via a Joint Personnel Adjudication System (JPAS)

16  pursuant to the Department of the Navy Personnel Security Program (SECNAV M-5510.30

17  (June 2006) and Chapter 10 "Continuous Evaluation" (pp. 10-1-5) and Chapter 10A "Continuous

18  Evaluation Check Sheet" (pp. 10A 1-30.  No reports are possible with concealed carriage.

19      DoDi 2000.16 requires inspections of persons and vehicles for the possession of firearms

20  prior to admitting access to Federal facilities/military installations. This again raises Second and

21  Fourth Amendment issues.

1        The confrontation created by the authorization of concealed carriage and the enforcement

2  of these federal laws that have particular relevance to the District of Columbia that is home to so

3  many federal installations raises the issue of the supremacy of Federal law under Article VI.

4                                    REQUESTS FOR RELIEF

5        It be declared that the "the right to bear arms" is limited to those enlisted in a well-

6  regulated Militia.

7        It be declared that interpreting the Second Amendment must adhere to and apply the

8  basic principle that a statute, *a fortiori,* the Constitution, must be read in its entirety, without

9  which the powers, rights and guarantees of other Articles and Amendments to the Constitution

10  are not given full force and effect.

11        It be declared that the expansion of the "right to bear arms" to include modern weapons,

12  such as assault rifles creates an atmosphere and perception among those possessing such

13  weapons that they may be used against lawful authority.

14        It be declared that overly broad and expansive interpretations of the "right to bear arms"

15  deny and inhibit the presence of government authority, the definition of anarchy.

16        It be declared that the concealed carry laws of the District of Columbia prevent and/or

17                  THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK

1    interfere with the enforcement of federal laws in violation of the Supremacy Clause, Article VI

2    of the Constitution.

3                                                            Respectfully submitted,
4                                                            Common Purpose USA, Inc.
5
6
7
8                                         By      _____
9                                                            Charles H. Helein
10                                                           Its Attorney
11                                                           D.C. Bar No. 81281
12   The Helein Law Firm PC
13   19309 Winmeade Drive, N-111, PMB#445
14   Lansdowne, VA 20176
15   703-297-7011
16   571-333-1564 fax
17   chelein@heleinlaw.com
18

19